ROBERT ZIGLAR, ADMINISTRATOR OF THE ESTATE OF LIZZIE IRENE ZIGLAR, DECEASED PLAINTIFF v. E. I. DU PONT DE NEMOURS AND COMPANY; STONEY VENABLE; MIDKIFF AND CARSON HARDWARE COMPANY; BASIL G. GORDON; AND A. B. CARSON, DEFENDANTS

No. 8017SC730

(Filed 21 July 1981)

**1. Sales § 24— toxic pesticide—no negligence of seller**

     In plaintiff's action to recover for the wrongful death of a farm worker who died shortly after drinking poisonous pesticide, the trial court properly entered summary judgment for the seller of the insecticide where plaintiff did not present any specific facts tending to show that the seller knew or should have known that the manufacturer's written warnings on the product's label were inadequate to warn others who could be expected to come into contact with the insecticide of its poisonous character nor did plaintiff demonstrate that the seller should have known that the purchaser would not appreciate the possible harm involved in using a toxic pesticide which was packaged in a clear plastic container and looked like water.

Ziglar v. Du Pont Co.

**2. Sales § 24— toxic pesticide — negligence of manufacturer**

In plaintiff's action to recover for the wrongful death of a farm laborer who drank a toxic pesticide, the trial court erred in entering summary judgment for the manufacturer of the pesticide where plaintiff's evidence raised questions for the jury as to whether the manufacturer exercised the required degree of due care in its general manufacture and packaging of the pesticide, whether the manufacturer failed to provide adequate warnings on the product's label to notify others of its toxicity, and whether the manufacturer's first aid instructions on the product's label were ambiguous and incomplete.

APPEAL by plaintiff from *Albright, Judge.* Judgment entered 29 April 1980 in Superior Court, SURRY County. Heard in the Court of Appeals 12 February 1981.

Plaintiff, as administrator, filed a negligence claim against defendants for the wrongful death of Mrs. Lizzie Irene Ziglar, who died shortly after she drank some poisonous insecticide. The court entered summary judgment for two of the defendants, the manufacturer and the retail seller of the insecticide.

The essential facts, as gleaned from the pleadings, interrogatories, depositions and affidavits, are these. In May 1974, Stoney Venable, a tobacco farmer, was using an experimental pesticide, "Vydate L Oxamyl Insecticide/Nematicide," in his tobacco plant beds. Du Pont manufactured the highly toxic chemical, which was, at that time, a clear liquid, with "a terrific odor — like rotten eggs," packaged in a translucent one-gallon container, similar to a plastic milk jug. The warning "Danger — Poison" was printed in red bold-face letters that were approximately 3/17 of an inch in height, on the front panel of the label on the Vydate L container. This warning included the symbol of a red skull and crossbones which was about 4/17 of an inch in height and 4/17 of an inch in width. The back panel of the label provided antidote and first-aid information and again emphasized the words "Danger" and "Poison" in red, bold-face type and included two additional red skulls and crossbones.

On 7 May 1974, Venable purchased another sealed container of Vydate L from a clerk at Midkiff and Carson Hardware Store. The employee who sold the product to Venable did not caution him in any way about the use of the product around humans. Venable placed the chemical in the back of his pickup truck under some old coveralls to keep it from falling over. Later that same

day, he put a blue mason jar of iced water and paper cups in the back of his truck, for the refreshment of his field hands and drove to where they were pulling tobacco plants.

Upon arriving there, Venable offered the water to the workers and poured himself a cup from the mason jar. A short while later, Mrs. Ziglar, a laborer, walked over to the truck to get a drink of water. She did not, however, pour from the mason jar; instead, she opened the container of Vydate L, which was located on the same side of the truck as the carton of paper cups, and drank some of the poison. She immediately commented, "[t]his tastes bitter," whereupon Venable jumped up and told her not to drink any more. After some discussion with Mrs. Ziglar, Venable drove her to his house where he gave her some warm salt water, in accordance with the instructions on the Vydate L label. A local doctor administered injections of the antidote to her, but she died shortly after she was admitted to a hospital. Her death was caused by a combination of the ingestion of the poisonous chemical and sickle cell disease in crisis.

Plaintiff now appeals from the entry of summary judgment on his negligence claims against Du Pont and the hardware store.

*David B. Hough, for plaintiff appellant.*

*Smith, Moore, Smith, Schell and Hunter, by J. Donald Cowan, Jr., for defendant appellee, E. I. Du Pont De Nemours and Company.*

*William G. Reid, for defendant appellees, Midkiff and Carson Hardware Store, Basil G. Gordon and A. B. Carson.*

VAUGHN, Judge.

Though this appeal is interlocutory because the judgment entered did not adjudicate all of the claims in the case or dispose of the cause as to all of the parties, *Bailey v. Gooding*, 301 N.C. 205, 270 S.E. 2d 431 (1980), we have elected, in our discretion, to treat the "appeal" as a petition for a writ of certiorari and shall proceed to address the merits of the case. G.S. 7A-32(c); App. R. 21(a).

The sole issue is whether the manufacturer and retail seller of an inherently dangerous toxic substance were entitled to summary judgment on plaintiff's products liability claims.[1]

It is elemental that it is usually the jury's perogative to apply the standard of reasonable care in a negligence action, and summary judgment is, therefore, appropriate only in exceptional cases where the movant shows that one or more of the essential elements of the claim do not appear in the pleadings or proof at the discovery stage of the proceedings. *Ragland v. Moore*, 299 N.C. 360, 261 S.E. 2d 666 (1980). *See, e.g., Moore v. Fieldcrest Mills, Inc.*, 296 N.C. 467, 251 S.E. 2d 419 (1979); *Strickland v. Dri-Spray Division Development*, 51 N.C. App. 57, 275 S.E. 2d 503 (1981). Consequently, when defendants moved for summary judgment in the instant case, they assumed the task of demonstrating that plaintiff would be unable to prove at trial sufficient facts to establish the following essential elements of a products liability action sounding in tort: "(1) evidence of a standard of care owed by the reasonably prudent person in similar circumstances; (2) breach of that standard of care; (3) injury caused directly or proximately by the breach, and; (4) loss because of the injury." *City of Thomasville v. Lease-Afex, Inc.*, 300 N.C. 651, 656, 268 S.E. 2d 190, 194 (1980) [citing Prosser, Handbook of the Law of Torts § 30 (4th ed. 1971)]. We hold that the defendant retail seller of the insecticide, Midkiff and Carson Hardware Store, has met this burden with respect to plaintiff's negligence claim against it and affirm the summary judgment entered in its favor. Nonetheless, we reverse the order of summary judgment for the defendant manufacturer because plaintiff did establish, by a forecast of his own evidence, the necessary elements of a products liability claim against Du Pont on several theories.

[1] The sum and substance of plaintiff's claim against the defendant Hardware is that it was negligent due to its "abject failure to give any warning whatsoever" to the purchaser, farmer

---

1. We note at the outset that this litigation was pending prior to 1 October 1979, the effective date of the new products liability act in Chapter 99B of the General Statutes. The statute does not, therefore, apply to the instant case, and we express no opinion as to whether its provisions might require a different analysis or result than that rendered herein. *See generally* Blanchard and Abrams, *North Carolina's New Products Liability Act: A Critical Analysis*, 16 Wake Forest L. Rev. 171 (1980).

Venable, about "the dangers inherent in using a poison which appears like water in a plastic beverage jug."[2] We disagree.

It is indeed true that a retail seller must exercise reasonable care in the sale of a dangerous product and that the performance of due care necessarily requires him to warn the purchaser of any hazard attendant to the product's use. Restatement (Second) of Torts § 401 (1965). *See Wyatt v. Equipment Co.*, 253 N.C. 355, 117 S.E. 2d 21 (1960). The supplier's duty to admonish, with respect to products manufactured by another, however, only arises if two circumstances simultaneously exist: (1) the supplier has actual or constructive knowledge of a particular threatening characteristic of the product and (2) the supplier has reason to know that the purchaser will not realize the product's menacing propensities for himself. *Stegall v. Oil Co.*, 260 N.C. 459, 133 S.E. 2d 138 (1963); Restatement, *supra*, § 388. *See generally* Annot., "Manufacturer's or seller's duty to give warning regarding product as affecting his liability for product-caused injury," 76 A.L.R. 2d 9 (1961). Neither circumstance appears on this record for the following reasons.

First, plaintiff did not present any specific facts, as opposed to mere general allegations, in response to defendant's motion for summary judgment, which tended to show that the Hardware knew or should have known that the manufacturer's written warnings on the product's label were inadequate to warn others, who could be expected to come into contact with the Vydate L, of its poisonous character. For example, plaintiff might have asserted the Hardware's actual or constructive knowledge about the defective nature of the manufacturer's warnings by showing that other customers had complained about Vydate L's dangerous propensity for being confused with water, that it had received special instructions from the manufacturer regarding this danger, or that the manufacturer had notified it that Vydate L was now available in a safer form, with amber coloration. *See, e.g., Wilson*

2. Plaintiff also alleged in the complaint that the Hardware was negligent because it sold the poison: (a) in a clear liquid form when it should have known that it was available in an amber color and (b) in a container which had no safety devices to prevent ingestion by humans. In his brief, however, plaintiff has relied on a single basis to show defendant's negligence: its failure to warn Venable verbally about the dangerous possibility that someone might mistakenly drink Vydate L as water. Accordingly, that is the sole issue we address in determining whether the trial court properly entered summary judgment for the hardware store.

*v. Chemical Co.*, 281 N.C. 506, 189 S.E. 2d 221 (1972). In the absence of facts similar to these, we must conclude that any insufficiency in the manufacturer's warnings, in light of the poison's colorless form and packaging in a translucent container, constituted a hidden defect which the Hardware had no duty to detect or remedy.[3] For, it is well-established that a seller of a product made by a reputable manufacturer, where he acts as a "mere conduit,"[4] "is under no affirmative duty to inspect or test for a latent defect, and therefore, liability cannot be based on a failure to inspect or test in order to discover such defect and warn against it." 2 Frumer and Friedman, Products Liability § 18.03[1][a] (1979); *Cockerham v. Ward*, 44 N.C. App. 615, 262 S.E. 2d 651, *review denied*, 300 N.C. 195, 269 S.E. 2d 622 (1980) (affirming the entry of summary judgment for the seller in a products liability case). *See* Restatement (Second) of Torts § 402, Comment d (1965), which explains that "[t]he burden on the seller of requiring him to inspect chattels which he reasonably believes to be free from hidden danger outweighs the magnitude of the risk that a particular chattel may be dangerously defective." This rule is particularly sound where, as here, the product is sold by the supplier in its original, sealed container. *See Davis v. Siloo, Inc.*, 47 N.C. App. 237, 267 S.E. 2d 354, *review denied*, 301 N.C. 234, 283 S.E. 2d 131 (1980) (affirming the dismissal of negligence claims against the distributors of a toxic substance); 63 Am. Jur. 2d Products Liability § 40, at 51 (1972). *See also* G.S. 99B-2(a). Thus, plaintiff has failed to show the first prerequisite to a retail seller's duty to warn: that the Hardware had reason to know about, or a legal duty to discover by the exercise of reasonable care, the product-connected danger complained of.

Second, plaintiff has also not demonstrated that the Hardware should have known that the purchaser, Venable, would not

---

3. The manufacturer's compliance with the minimum statutory labeling requirements for toxic pesticides under federal and state law further supports the conclusion, that in these circumstances, any deficiency in the written warnings on the Vydate L label was not reasonably discoverable by the retail seller. *See* 7 U.S.C. § 136(q)(2)(D) and G.S. 143-443(a)(3) (mandating the use of skull and crossbones, the display of the word "poison" prominently in red on a contrasting background, and the inclusion of antidote information).

4. There is no evidence in this record that the defendant Hardware did anything more than simply serve as a "middleman" between the manufacturer and a willing purchaser in an ordinary commercial sale.

appreciate the possible harm involved in using a toxic pesticide which was packaged in a clear, plastic container and looked like water. In the instant case, Venable testified that he frequently administered toxic chemicals in his professional pursuit of farming "to make it pay off." At a minimum then, he should have been generally aware of the dangers involved in using pesticides and the special need to store such substances carefully. In addition, however, Venable also had reason to know of the peculiar dangers associated with Vydate L, for he said that when he purchased the *second* container of the poison on 7 May 1974, he had previously read the manufacturer's label and warnings, had also read about the product in an agricultural bulletin and understood it was an experimental pesticide. These facts persuade us that any tendency of Vydate L to be mistaken for harmless water should have been plainly observable to Venable, a professional user of toxic substances, which thereby obviated any obligation of the Hardware to warn him further. It is manifest that a retail seller has no duty to warn of an obvious hazardous condition which a "mere casual looking over will disclose." Restatement (Second) of Torts § 388, Comment k (1965); Annot., *supra*, 76 A.L.R. 2d 9, 28 (1961). Moreover, there is simply no compelling reason to require a seller "to warn a person who in his occupation or profession regularly uses the product against any risk that should be known to such a regular user." 63 Am. Jur. 2d Products Liability § 51, at 61 (1972).

We thus hold that no legal duty of the retail seller to warn the purchaser was triggered in this case as a matter of law. In sum, the Hardware did not violate any standard of reasonable care by failing to give verbal warnings, about the myriad circumstances in which Vydate L might be confused with drinking water, in addition to the general warnings provided by Du Pont on the sealed container's label. In this situation then, the Hardware has plainly shown that an essential element of plaintiff's negligence claim is missing—defendant's breach of due care, the absence of which properly authorized the judge to enter summary judgment in its favor.

[2] On the other hand, however, the defendant manufacturer, Du Pont, did not successfully negate the existence of an essential element of plaintiff's negligence claim against it. Viewing all the evidence in this record in the light most favorable to plaintiff

with the benefit of every reasonable inference arising therefrom, *Page v. Sloan*, 281 N.C. 697, 706, 190 S.E. 2d 189, 194 (1972), we hold that genuine issues of material fact, concerning the reasonableness of Du Pont's conduct, were raised on three bases.

The first basis of plaintiff's products liability claim is that Du Pont did not exercise the required degree of due care in its general manufacture and packaging of Vydate L. A manufacturer must execute the "highest" or "utmost" caution, commensurate with the risks of serious harm involved, in the production of a dangerous instrumentality or substance.[5] *See Davis v. Siloo, Inc.*, 47 N.C. App. 237, 267 S.E. 2d 354, *review denied*, 301 N.C. 234, 283 S.E. 2d 131 (1980); *see also Luttrell v. Mineral Co.*, 220 N.C. 782, 18 S.E. 2d 412 (1942). Here, a jury question was raised about whether Du Pont was sufficiently cautious in the production of Vydate L by plaintiff's *prima facie* showing that: (a) Du Pont knew that the insecticide was a dangerous substance; (b) Du Pont manufactured the highly toxic chemical as a colorless liquid and packaged it in clear plastic jugs; and (c) Vydate L, in this form, could be easily mistaken for water in its appearance. *See* Restatement (Second) of Torts § 388 (1965). In this regard, the relevant facts are as follows.

Du Pont noted, in its own information bulletin about the product, that Vydate formulations were highly toxic and that its exposure to humans should be avoided. Du Pont also admitted, in its answers to plaintiff's interrogatories, that the insecticide was a clear liquid in a translucent container during its experimental marketing in 1973 and 1974, and Venable said he purchased the product in this form in May 1974. Dr. Modesto Scharyj, an expert witness in pathology, testified that Vydate L was a "completely colorless chemical; and for that reason it was easy for [him] to

---

5. This standard of care is not to be confused with strict liability which is not recognized in this State in products liability cases. *Smith v. Fiber Controls Corp.*, 300 N.C. 669, 268 S.E. 2d 504 (1980). Simply put, even though a negligence standard is applied, a manufacturer must be more careful in the manufacture of dangerous articles for his conduct to be deemed reasonable than would otherwise be necessary in the manufacture of products with less dangerous propensities. *See also Cockerham v. Ward*, 44 N.C. App. 615, 619, 262 S.E. 2d 651, 654 (1980), where the Court explained: "a manufacturer is not an insurer of the safety of products designed and manufactured by him, but is under an obligation to those who use his product to exercise that degree of care in its design and manufacture which a reasonable prudent man would use in similar circumstances."

understand how [decedent] could possibly confuse that chemical with water," at least while the container was sealed. The affidavits of decedent's fellow laborers, as well as the deposition of her employer, moreover, all tend to support the conclusion that she drank the poisonous chemical intending to refresh her thirst, with some *water*, as she had previously been advised.

The law requires a manufacturer to eliminate the dangerous character of goods to the extent that the exercise of reasonable care, considering all of the circumstances, enables him to do so. *See Cashwell v. Bottling Works*, 174 N.C. 324, 93 S.E. 901 (1917). It is not without significance, therefore, that Du Pont began bottling Vydate L in gray, opaque containers, on 24 May 1974, shortly after this tragic accident occurred, as requested by the State of North Carolina, and that it added amber coloration to the colorless poison in January 1975. Thus, on this record, a critical factual issue, and one not susceptible to disposition by summary judgment, was whether Du Pont was negligent in manufacturing an inherently dangerous toxic substance without taking reasonable precautions to decrease the risk of its lethal confusion with ordinary, harmless drinking water.

Another basis of plaintiff's claim is that Du Pont did not provide the kinds of warnings on the product's label which were reasonably necessary to notify persons of Vydate L's poisonous character, especially in light of the chemical's marked resemblance to water. It is well-established that a product is defective if it is not accompanied by adequate warnings of the dangers associated with its use and that these warnings must be sufficiently intelligible and prominent to reach and protect all those who may reasonably be expected to come into contact with it. Prosser, Handbook of the Law of Torts §§ 96, 99 (4th ed. 1971); *see Corprew v. Chemical Corp.*, 271 N.C. 485, 157 S.E. 2d 98 (1967). The manufacturer's duty to warn unquestionably requires him to be particularly careful in labeling poisons so they may be properly identified and used. *See Fowler v. General Electric Co.*, 40 N.C. App. 301, 307, 252 S.E. 2d 862, 866 (1979); Epstein, Products Liability: The Search for the Middle Ground, 56 N.C. L. Rev. 643, 653 (1978). While it is true that Du Pont fulfilled the applicable statutory requirements for the labeling of a poisonous insecticide (see note 3, *supra*) and that Vydate L had a "slight

sulfurous" odor,[6] we cannot say that such warnings were entirely adequate as a matter of law. Rather, such facts were but a part of the total circumstances to be weighed and considered. Indeed, the following facts tended to show that Du Pont had *not* taken every reasonable precaution to admonish against the risk of confusion of the chemical with a drinkable beverage: (1) again, the insecticide was distinctly similar to water in appearance; (2) there was no evidence that decedent could read or write; and (3) the skull and crossbones symbols on the label were small—only 4/17 of an inch in height and 4/17 of an inch in width. Further, we would note that it should not have been unforeseeable to Du Pont that Vydate L would be used in close proximity to farm laborers, who might be illiterate, since it intended the insecticide "to be used mainly as a spray or transplant water treatment" on tobacco, which is generally known to be a labor-intensive crop.

Two decisions of this Court are particularly instructive here: *Davis v. Siloo, Inc.*, 47 N.C. App. 237, 267 S.E. 2d 354, *review denied*, 301 N.C. 234, --- S.E. 2d --- (1980), and *Whitley v. Cubberly*, 24 N.C. App. 204, 210 S.E. 2d 289 (1974). In *Davis*, the decedent was killed by aplastic anemia resulting from exposure to Petisol 202 in the course of his employment. The plaintiff administratrix filed a negligence claim against the manufacturer, alleging, among other things, that the label on the product's container inadequately admonished the user to avoid prolonged skin contact with the chemical. The Court affirmed the denial of defendant's motion to dismiss the negligence claim and held, in pertinent part, that:

> "the manufacturer of the dangerous substance will be subject to liability under a negligence theory for damages which proximately result from the failure to provide adequate warnings as to the product's dangerous propensities which are known or which by the exercise of care commensurate with the danger should be known by the manufacturer, or from the failure to provide adequate directions for the foreseeable user as to how the dangerous product should or should not be used with respect to foreseeable uses."

---

6. We agree with plaintiff that at least a question of fact is raised as "to whether or not an odor [of the insecticide] in an open tobacco field on a hot and muggy day suffices as a warning of a dangerous poison to a farm worker who has labored and sweated under the hot sun for several hours."

47 N.C. App. at 245-46, 267 S.E. 2d at 359. In *Whitley*, the plaintiff's intestate also died from aplastic anemia after the administration of a certain drug duly prescribed by her physician. Two of the bases of the administrator's claim against the drug manufacturer were that it improperly marketed and over-promoted the drug and failed to provide sufficient warnings about the drug's dangerous tendencies to the medical profession, as well as consumers thereof. This Court held that such allegations raised genuine factual issues and therefore reversed the trial judge's order of summary judgment for the defendant manufacturer. Significantly, the Court further stated:

> "That Parke, Davis may have fully complied with all applicable Federal laws in its marketing and labeling Chloromycetin would not in itself free it of liability for harm caused by use of the drug if it were shown that such use and resulting harm was caused by the company's negligent acts in over-promoting the drug, the dangerous properties of which it was aware or in the exercise of due care should have been aware."

24 N.C. App. at 207, 210 S.E. 2d at 292. These two cases provide authoritative support for our holding that plaintiff's allegations regarding the inadequacy of Du Pont's warnings raised factual issues, legally sufficient to withstand a motion for summary judgment, because defendant did not come forward with "uncontradicted evidentiary material to show that it was not negligent" in this respect. *Whitley, supra.* We likewise do not believe that Du Pont's compliance with all statutory labeling requirements would necessarily exonerate it from liability for its possibly negligent acts in failing to take greater steps, *i.e.*, using more prominent written warnings and symbols on the product's label, to prevent this toxic colorless liquid from being mistaken for water.

Plaintiff presented ample evidence to support its negligence claim on another competent ground: that the product's label was further deficient because the first-aid instructions listed thereon were not clear or complete. Those instructions provided, in part, as follows: "If swallowed, give a tablespoon of salt in a glass of warm water and repeat until vomit fluid is clear." Stoney Venable testified that, almost immediately after decedent drank some of the poison, he read the label on the jug and noted the foregoing

advice. He then got decedent to accompany him in his truck to go to his house to get some warm salt water. This took approximately eight minutes. Decedent became unconscious a short while later. Plaintiff contends that Du Pont's emphasis on the use of warm salt water was misleading because it incorrectly focused attention "on obtaining salt water rather than on inducing regurgitation" and that this improper focus on the actual remedy to be pursued "precipitated a time-consuming rush in search of salt water and caused the quick induction of vomiting to be overlooked altogether." This contention is well-supported by the following facts. First, Du Pont admitted, in its own answers to interrogatories, that it was "desirable to induce vomiting by whatever means is immediately available in order to remove as much of the substance as possible from the body." In addition, Du Pont clearly stated in its information about Vydate L which was sent to poison control centers across the country that the first-aid treatment for ingestion was to "[i]nduce emesis or perform gastric lavage." Moreover, Du Pont advised, in a 1977 publication of information for physicians regarding the symptomatology and treatment of cases involving Vydate L, that an appropriate first-aid step to be taken before the arrival of a physician was to "drink 1 or 2 glasses of water and induce vomiting by touching back of throat with finger or blunt object." We believe that such facts raised a substantial question as to whether Du Pont was negligent in not instructing more plainly, on the product's label itself, that, in cases of accidental ingestion, vomiting should be immediately induced by whatever means available.[7]

Plaintiff's evidence challenging the completeness of the label's antidote information was as follows. The label advised: "Atropine sulfate should be used for treatment. Administer repeated doses, 1.2 to 2.0 mg intravenously every 10 to 30 minutes until full atropinization is achieved." In its 1977 information bulletin to physicians about Vydate L poisoning, however, Du Pont distinguished between the procedures to be followed in cases of mild or severe intoxication. The directions in the bulletin for mild intoxication were the same as those printed on the product's label in 1974, but a different treatment was advised for

7. Many situations could arise where, as here, a glass of warm salt water is not instantly obtainable as compared with the almost constant availability of a finger or two.

severe intoxication: an initial intravenous dosage of 2 to 4 mg to be repeated every three to ten minutes. Du Pont offered no evidence showing why it did not provide the additional antidote information for cases of severe poisoning, or why it was not negligence for it to fail to do so, on the product's label during its experimental marketing. Du Pont thus failed to negate plaintiff's claim that it was negligent for only providing adequate antidote instructions for cases of mild poisoning alone. Moreover, the following facts clearly demonstrate that plaintiff's claim was well-substantiated. Venable testified that, after attempting the warm salt water treatment at his house, he drove decedent to a physician's office, and when they arrived there, she was already unconscious and "slumped over" in the back of his truck. Venable took the Vydate L jug into the office and explained what had happened. The doctor then went out to the truck and gave her a shot. The rescue squad was called, and she was taken to the hospital, which was some twenty to twenty-five minutes away. From these facts, it would be reasonable to infer: (1) the doctor read the antidote information on the jug's label and administered *one* injection of atropine in the amount suggested, which was only sufficient for mild intoxication; (2) that decedent was suffering from severe intoxication of the chemical when the antidote was given since she was unconscious at the time; (3) that if the physician had read about the different treatment for severe poisoning on the label, he would have administered greater quantities of atropine and instructed the rescue squad team to give her additional shots every three to ten minutes during the twenty-five minute trip to the hospital; and (4) that decedent's death might have been prevented if she had received larger amounts of atropine.

Plaintiff also alleged that Du Pont was negligent because it did not exercise reasonable care in disseminating medical information about Vydate L to poison control centers from the outset of the product's experimental marketing in 1973 and 1974. The record indicates that an index card, including treatment information for Vydate L poisoning, was not filed with the National Clearinghouse for Poison Control Centers until August 1974, three months after this fatal accident occurred. These facts, standing alone, would not, however, support plaintiff's products liability claim because, even if Du Pont did not exercise due care in disseminating this information earlier, there is no evidence

anywhere in this record tending to establish a causal connection between such an omission of care and the resulting injury.[8]

In sum, we hold that plaintiff substantiated a products liability claim against the defendant manufacturer on three grounds: (1) its negligent manufacture and packaging of Vydate L; (2) its failure to provide adequate warnings on the product's label to notify others of its toxicity; and (3) its negligent provision of ambiguous and incomplete first-aid instructions on the label.[9] We further hold that the defense of contributory negligence was not established in this case as a matter of law. "[P]roximate cause is ordinarily a question of fact for the jury, to be solved by the exercise of good common sense in the consideration of the evidence of each particular case." Prosser, Handbook of the Law of Torts § 45, at 290 (4th ed. 1971); see *Williams v. Power & Light Co.*, 296 N.C. 400, 403, 250 S.E. 2d 255, 258 (1979). Though it may be true, as Du Pont contends, that decedent should have known that this poisonous liquid was not water in a beverage jug because she first had to break the seal of the container, and the liquid had a distinct odor like rotten eggs, such factual occurrences were merely a part of the total circumstances to be considered by a jury in deciding whether decedent's death was caused by her omission of due care for her own safety or by the manufacturer's failure to exercise reasonable care in the production of an inherently dangerous substance. *See Hale v. Power Co.*, 40 N.C. App. 202, 252 S.E. 2d 265, *review denied*, 297 N.C. 452, 256 S.E. 2d 805 (1979).

Plaintiff also assigned as error the trial court's refusal to permit the introduction of two affidavits on the day of the hearing on defendants' motions for summary judgment. Rule 56 of the Rules of Civil Procedure plainly provides that, on a motion for summary

8. Plaintiff might have established the essential causal link of such a claim by showing, for example, that either the initial treating physician, or the hospital physicians, had attempted, in their efforts to revive decedent, to locate this medical information by contacting the nearest poison control center.

9. Though the statute does not apply to this litigation, see note 1, *supra*, we would comment that our holding is consistent with the tenor of the new products liability act which recognizes claims for personal injury or death resulting from "the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging or labeling of any product." G.S. 99B-1(3).

judgment, the adverse party may serve opposing affidavits *"prior to the day of hearing."* G.S. 1A-1, Rule 56(c). Thus, it would seem that the judge did not abuse his discretion in denying plaintiff's request to introduce the affidavits; however, for purposes of this case, it suffices to say that plaintiff has suffered no prejudice from the omission of this material from the record for two reasons. First, neither affidavit contained facts which would further support the existence of a duty to warn by the retail seller, and, thus, even if such evidence should have been admitted and considered, it would not alter our affirmance of the judgment entered in the defendant Hardware's favor. Second, while the evidence in these affidavits did tend to enhance plaintiff's negligence claim against the defendant manufacturer, any consideration of the propriety of the judge's exclusion thereof, is rendered unnecessary by our decision reversing the judgment entered for Du Pont on the record as it *now* stands. Plaintiff will presumably have, therefore, the opportunity to present and develop this evidence, as he wishes, at the full trial of the matter.

The order of summary judgment entered for Midkiff and Carson Hardware Store is affirmed.

The order of summary judgment entered for E. I. Du Pont De Nemours and Company is reversed.

Affirmed in part; reversed in part.

Judges WELLS and BECTON concur.